# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

      Plaintiff-Appellee,

v

JAMES PATRICK O'CONNELL,

      Defendant-Appellant.

UNPUBLISHED
November 5, 2015

No.  321939
Oakland Circuit Court
LC No.  2013-247621-FC

Before:  METER, P.J., and WILDER and RONAYNE KRAUSE, JJ.

PER CURIAM.

Defendant appeals as of right his jury trial convictions of two counts of first-degree criminal sexual conduct (CSC), MCL 750.520b(1)(a) and (2)(b) (victim under 13 years of age and defendant 17 years of age or older), and two counts of second-degree CSC, MCL 750.520c(1)(a) and (2)(b) (victim under 13 years of age and defendant 17 years of age or older). The trial court sentenced defendant to 25 to 50 years' imprisonment for each first-degree CSC conviction and 15 to 22 years' imprisonment for each second-degree CSC conviction. We affirm.

## I.  FACTS AND PROCEEDINGS

This case arises from allegations that defendant sexually abused the victim, a minor, during his volunteer work at St. Augustine Lutheran Church and preschool.

## A.  TRIAL TESTIMONY

The victim was seven years old at the time of trial. She recalled attending preschool at St. Augustine sometime between the ages of two and five. Defendant was the person "who cleaned stuff." She testified that defendant "did a bad thing" while she attended the preschool. According to the victim, defendant would kiss her "at St. Augustine maybe and maybe when we went to his house." When asked whether there were adults around when it happened at St. Augustine, the victim said, "I forgot." When asked specifically what she did with defendant, she testified that he would lick her "privacy place." The victim did not recall how old she was the first time that defendant did this, but she thought she might have been two or three years old. The victim testified, "I do remember the garage and when nobody was around in the building and sometimes he would scratch my privacy place under the marble table." She went to the garage alone with defendant. The victim stated that sometimes she would go on walks with

-1-

defendant and he would "scratch" her privacy place sometimes on her bare skin and sometimes on top of her clothes. The victim did not remember how many times defendant licked her privacy place, but she thought it happened every day.

The victim was afraid to tell her parents because she thought they would be mad at her. The first time that the victim's mother asked her if anyone had touched her, the victim did not tell her mother. However, the second time her mother asked, the victim told her mother. The victim told her mother that defendant "licks her pee pee place." The victim also testified that she and her mother went to defendant's house once and, while her mother was downstairs, defendant licked her privacy place in his bedroom. The victim also saw defendant's privacy place and licked it while they were by the woods at St. Augustine. When asked about the incidents in the garage, the victim testified that she would lie on a blue plastic box that was by a window so defendant could see if anyone was coming. The victim testified that defendant gave her a book and marbles.

The victim's mother testified that the victim began attending St. Augustine when she was four years old. The victim attended St. Augustine on Tuesday and Thursdays, and her father would drop her off and pick her up during the first year. The second year, the victim attended St. Augustine on Mondays, Wednesday, and Fridays, and the victim's mother did more of the dropping off and picking up. At that time, the victim's mother began having more interactions with defendant. She understood that defendant was partly a maintenance person and partly a teacher's aide. Defendant would be around the children, talking to them and hugging them. The victim's mother did not realize at the time that he was a volunteer. One day, the victim's mother observed the victim and other children hanging on defendant's legs. She also recalled defendant picking up the victim and hugging her, which made the victim's mother uncomfortable because of the victim's age. Defendant was friendly and would tell the victim's mother about things he was doing with the children or the school. He also invited the victim's mother to his house several times to see an eagle statue that he had carved. In hindsight, the victim's mother believed that defendant's behavior was predatory. Defendant also asked if he could take the victim to the movies. Defendant told the victim's mother that she should sign up the victim to help with the garden at the school in the summer and that the victim's mother did not have to stay. In 2012, the victim's mother went to pick up the victim from Vacation Bible School and the victim was out in the garden with defendant. The incident, along with "some other things," led the victim's mother to ask the victim if anyone had ever touched her. Sometime before Vacation Bible School, the victim's mother and the victim stopped at defendant's house to see the eagle statue. At one point, the victim's mother used the bathroom and left the victim alone with defendant for a few minutes.

The victim's mother twice asked the victim whether anyone had ever touched her. The first time, sometime after Vacation Bible School in 2012, the victim's mother asked the victim if anyone had ever touched her in her privacy place. She did not mention defendant's name, but she did ask because of what she observed with defendant. The victim did not disclose anything. In the fall of 2012, when the victim no longer attended St. Augustine, defendant stopped by the victim's family's house to drop off a book as a gift for the victim. Defendant said that he stopped by other children's houses and brought them books as well. Subsequently, while they were out of town, defendant stopped by their house and left a marble in their mailbox.

In May 2013, the victim's mother was discussing summer camps with her coworker and the coworker pointed out that sometimes people who do inappropriate things with children tell the children to lie. After that conversation, the victim's mother decided to again ask the victim if anyone had ever touched her in her privacy area. The victim said "don't be angry," and the victim's mother said that she would not be angry and asked if it was another child. The victim shook her head no and then said that it was defendant. When the victim's mother asked what she meant, the victim stuck out her tongue and pointed at it. After the victim's mother called her father and the victim's father, they took the victim to the police station. The victim's mother did not pepper the victim with questions. Within the following week, the victim went to the Care House for an interview.

The victim's father testified that he saw defendant occasionally when he dropped off or picked up the victim. He understood defendant to be actively involved at the church, mainly with maintenance. He would observe the victim say goodbye to defendant and talk with him. The victim's father did not have any concerns or suspicions about inappropriate behavior involving defendant until defendant visited their home unexpectedly. At that time, he was not really suspicious, but he thought the visit was odd. The second red flag was when defendant visited their home for a second time, but they were not home. The victim's father recalled talking with defendant about issues they were having with rodents in their basement, but he did not ask defendant to come over and do any work.

Diana Allen attended St. Augustine and met defendant there. In approximately 2007 or 2008, Diana Allen and her grandchildren attended a spring or fall cleanup at the church. Diana Allen left her granddaughter, who was four years old, on the playground. When Diana Allen looked over, she saw defendant holding her granddaughter's hand and walking her away from the playground toward the wooded area. Diana Allen called her granddaughter over and kept her near her the rest of the time. On another occasion, Diana Allen saw her granddaughter place her hand into defendant's pocket. When asked what she was doing, her granddaughter stated that she was getting candy. Diana Allen's grandson said that he had also taken candy from defendant's pocket. Diana Allen was also involved with the afterschool latchkey program and she observed defendant on the playground with the children with one of the girls on his shoulders.

Diana Allen's husband, Orville Allen, worked with defendant doing maintenance at the church. Orville Allen once saw his grandson go into defendant's pocket for candy. Orville Allen told defendant that he thought it was inappropriate. On one or two occasions Orville Allen saw defendant with a group of kids out in the garden with no teacher present. Orville Allen and defendant may have "bumped heads" regarding their work, but there was never an argument between them. Defendant took over Orville Allen's position as head trustee at the church.

Sarah Breidenich's youngest daughter attended St. Augustine's preschool for a few weeks in 2011. Breidenich stopped her daughter's attendance after observing defendant playing on the playground with the children one day when she came to pick up her daughter. A preschool teacher was on the other side of the playground, but Breidenich was concerned. Defendant then began interacting with Breidenich's oldest daughter, asked her questions, and gave her a magazine. Breidenich thought it was odd because at other preschools no one is

-3-

allowed to interact with the children unless they are a parent picking up a child. Although the director of the preschool assured Breidenich that defendant was fine, that he was never left alone with the children, and that he loves children, Breidenich still did not feel comfortable.

Charlene Goshgarian was the director of the preschool. Defendant performed work for her when she was starting up the preschool. Goshgarian considered defendant and his wife as her friends. At some point, defendant also began helping with the children, but not on a regular basis. Goshgarian never observed defendant take children to the garden by himself. Defendant was not allowed to take children to the garden, playground, or marble room by himself. There was never a time when the teachers would not know where a child was. It would not have been possible for a child to disappear with defendant. When the investigation of this case began, Goshgarian was interviewed by law enforcement. After her second interview, she felt that the questions were one-sided and that the detective was looking for specific information about defendant. Goshgarian told the detective that if defendant took the children to the garden a teacher should have been with him, but Goshgarian could not say that a teacher was always present because she did not observe it. After Breidenich withdrew her daughter from the preschool, Goshgarian emphasized to the teachers that no volunteer should be left alone with the children.

Detective Kristine Shuler was the officer in charge of this case. She testified that in the course of investigating sexual assault cases, if she determines that there is not enough evidence, then criminal charges will not be brought. Detective Shuler interviewed defendant. Defendant said that there were times when he would be left alone with a group of children in the fellowship hall playing with the marbles. He also stated that there were times that he would take children to the garden alone. Defendant stated that the rule that volunteers were not to be alone with children was not always followed. He indicated that it was possible that one time during Vacation Bible School he was alone with the victim in the garden for a short period of time. Defendant said that he gave all the children a marble at the end of the school year, he often had candy, and he brought the victim a book to her home. Defendant said that the victim did come to his house and that he and the victim were alone in his bedroom for a short period of time, approximately 10 to 15 seconds. He subsequently stated that he did not recall being alone in the bedroom with the victim. Defendant also said that he went to the victim's house because of a rodent problem and he brought the victim a book. It happened to be near the time of the victim's birthday. He also dropped off a marble or marbles on one occasion. Defendant indicated that there was a time when children took candy from his pockets.

Detective Shuler testified that, during the Care House interview, the victim said "I think" numerous times. However, Detective Shuler believed it was apparent that "I think" was just a term the victim used, part of her normal language. When asked by the jury whether anyone else was considered as a possible abuser, Detective Shuler stated that "[t]here was never any indication during this entire investigation that the suspect was anyone else other than . . . defendant."

Numerous witnesses testified on defendant's behalf at trial, including Dr. Katherine Okla, who was qualified as an expert in forensic psychology, with expertise in suggestibility, forensic interviewing techniques, and memory research. Dr. Okla reviewed the police reports and forensic interview, but did not interview the victim. Dr. Okla would not, and could not, say

whether the victim was lying. Dr. Okla testified that memories are not always accurate and children are particularly susceptible to social influences. She further testified that a false belief is not a lie, but "an actual belief that's not accurate or a belief that something happened in a particular way when that's not really how it happened." False memories are not difficult to develop, and can develop without a person understanding or recognizing it. Social pressures impact memory; examples include tone of incrimination and reinforcement. Dr. Okla testified that if there is "interviewer bias you are more likely to get less accurate information and you can shape it to get particular responses based on what you think happened." Interviewer bias can exist when a mother talks to her child. She testified that "mom's [sic] are understandably not neutral. They also are not typically aware of how suggestibility works or what interviewing techniques are more or less likely to get reliable or accurate information." Dr. Okla also testified that just because a child remembers more details does not mean the memory is more accurate.

Dr. Okla gave a summary of the protocol to be used in interviewing a child. She explained that after introducing the surroundings and explaining the ground rules, the next step is a "practice narrative" regarding past events in order to assess the child's language skills and memory. Then the child should be asked to give a "free narrative" of what happened, followed by a clarification phase. Dr. Okla did not recall seeing a practice narrative done with the victim and she believed it should be have been done because of her age and because she was "fairly off topic." Dr. Okla testified that the victim "was moving around the room," sometimes giving unresponsive statements, and "it would have been important to get a sense of how closely she could give a detailed description of a past event." Dr. Okla testified that "repeated questions even when the child says they don't have a memory means that you're not satisfied and that you want them to come up with something." Dr. Okla was critical of the interviewer's questions of the victim and testified that the interviewer should have reminded the victim that she should not guess. The victim's use of the terms "I think" and "I would say" should have been clarified because they "might just be a matter of speech," but they could mean that she really did not know. Dr. Okla noted the interviewer's repeated questions to the victim after the victim had given an answer, which suggested that the interviewer wanted another answer. The purpose of the interview is to get the most accurate information.

Defendant also testified at trial. He denied ever licking the victim's vagina, intentionally touching her vagina, or having the victim lick his penis. Defendant began volunteering at the preschool approximately four years earlier. The first year he was only at the preschool approximately 8 to 12 times and he mostly fixed toys. The next year he began greeting parents and helping with lunch. His volunteering was not consistent; he might be there one day a week or not be there for three weeks. During the 2011-2012 schoolyear, defendant was at the preschool sporadically on Tuesdays and Thursdays, and only once in a while on Mondays, Wednesdays, and Fridays, which were the days that the victim attended. Defendant recalled during Vacation Bible School in 2012 telling the victim's mother, who was in the preschool hallway, that he was going to take the victim to the garden. By the time they were in the middle of the parking lot, the victim's mother was following behind. Defendant never took the victim out of the classroom. He was never left alone with one student, but was occasionally left with a group of students for a brief period of time. When they played marbles in the fellowship hall during the 2011-2012 schoolyear, defendant would be left alone with a group of children for 5 to 10 minutes. The doors to the fellowship hall would always be left open and people would come in an out all the time. When defendant took children to the garden there was always a teacher

following close behind. He did not specifically recall being alone with the children in the garden for a period of time. Defendant testified that he could not fit under the marble table.

Defendant testified that when the victim and her mother came to his house, they went upstairs and the victim jumped on his bed. The victim's mother told her that was not appropriate. They then looked at defendant's son's room and on the way back defendant went in his own room to get some marbles. The victim followed him, but her mother was standing right there in the hallway. Defendant was very surprised that the victim was making these allegations. Defendant never told the victim's mother that he wanted to take the victim to the movies. He was equally friendly with other families as with the victim's family. Defendant never told the victim's mother that he would take care of the victim while the victim's mother watered the garden. Defendant purchased a book on a trip to the Mediterranean. One day he was driving and saw the victim's home and decided to stop. He brought in the book and a business card, but he did not intend to give the victim the book before that time. He was there for 15 or 20 minutes and they discussed playing marbles. He then came back another time and dropped off his business card and some marbles. Defendant testified that he did not leave a note with the value of the marbles. However, at trial, defendant recognized the note as one that was written by the preschool teacher when defendant gave a marble to every child at the end of the year. Defendant never had candy in his pockets that the children would take at the preschool. However, once Orville Allen's grandson took candy out of his pocket at church on Sunday. Orville Allen was present when this happened and was not mad at defendant. Defendant was surprised when he was arrested because he offered to turn himself in if a warrant was issued. Instead, while he and his wife were on a bike ride, two police cars boxed them in. Defendant testified that this was unnecessary.

The prosecution called Sarah Killips as a rebuttal witness. Killips was qualified as an expert in forensic interviewing and suggestibility research. Killips testified that there were several portions of the Care House interview transcript that said "inaudible." When she reviewed the video recording she had to play it multiple times and increase the volume, but she was confident that she was able to fill in a number of the inaudible portions. There was also "a decent amount" that she could not fill in. Killips described the interview process. She testified that the interviewer was attempting "to figure out where exactly certain types of touches happened which can be difficult with young children." She explained that in order to get the information without suggesting anything, the interviewer rephrased her question. Killips testified that this interview was not perfect. Killips testified that at one point the interviewer asked the victim a closed multiple choice question, which is less preferred that other types of questions. However, the victim then said, "none of those," so the question was not damaging. Killips was asked to discuss the question posed to the victim, "how was [defendant's] body." She testified that children are often literal and she was not surprised that the victim answered which a physical description ("he has black hair"), rather than a body position. Killips agreed that the goal is to obtain as much of the truth as the child can tell you. When asked about the victim's demonstration during the interview (she lied down on the couch when talking about how she got on defendant's bed), Killips testified that children do not always have the vocabulary for discussing sexual acts so they try to demonstrate. Killips agreed that sexual assault may not necessarily be traumatic to a child who does not even know that certain body parts are private or that something happening to those private parts might be bad.

When asked by the jury if she discusses her opinions and conclusions with law enforcement after the interview, Killips stated that "[i]n Oakland County we have a really great advocacy center. Not everywhere does. Not everywhere has interviewers who are trained well." Defendant counsel stated that she should answer the question, which the trial court read again, and Killips stated that "[s]ome investigators aks for the forensic interviewer's opinion on various topics." Defense counsel again stated that the question was just whether she gives her opinion and Killips stated that she often did.

Detective Shuler was also called in rebuttal and explained that defendant was arrested in the manner that he was because there was mention during the investigation that defendant was contemplating suicide and he possibly had access to a firearm. Defense counsel objected, but the trial court ruled that defense counsel opened the door to the question by asking about the arrest.

## B. PROCEDURAL HISTORY

Defendant was charged with two counts of first-degree CSC and two counts of second-degree CSC. On November 8, 2013, the prosecution filed a notice of its intent to introduce other acts evidence at trial pursuant to MRE 404(b) and a motion in limine to admit such evidence at trial. The prosecution argued that other acts evidence was relevant to show opportunity, intent, scheme, plan, or system of doing an act. In the brief in support of the motion, the prosecution identified the witnesses it intended to call to testify regarding other acts—Diana Allen, Breidenich, Chanel Kizzi, and Orville Allen. Defendant responded that Diana Allen's purported testimony that she saw defendant walking alone with her granddaughter toward the woods and Breidenich's testimony that she saw defendant playing alone with the children on the playground was not MRE 404(b) evidence and that it should be admitted at trial without any limiting instruction. Defendant argued that Chanel Kizzi's testimony that she saw children sit on defendant's lap was irrelevant, but other witnesses would testify that they saw children sit on his lap. Finally, defendant argued that Orville Allen's testimony that he saw his grandson reach in defendant's pocket for candy was irrelevant, but, regardless, was not a bad act.

On November 12, 2013, defendant filed a motion to amend the protective order, which had been entered by the district court and allowed defense counsel to have a copy of the videorecording. Defendant claimed that the videorecording contained 91 words or sections that were "inaudible" and defendant wished to consult an audio forensic expert to determine whether the audio quality could be improved, as the audio recording could not currently be used effectively by the defense. He argued that, without enhancement of the recording, he would be denied an effective attorney, a fair trial, effective use of an expert, and due process. Defense counsel conferred with an audio and video computer forensic consultant who believed it may be possible to produce a better recording, but it would be necessary to download the recording to his equipment, enhance it, and reproduce an enhanced version. Defendant requested that the trial court allow these steps to be taken. The prosecution responded that MCL 600.2163a does not allow a video to be copied, except within certain parameters and under a protective order. The prosecution argued that defendant's request was, therefore, not permitted by statute.

On November 13, 2013, defendant filed a motion to quash or, in the alternative, for a competency hearing of the victim. Defendant argued that, based on the Care House interview, there were issues regarding the victim's competency because her memory was unreliable. The

prosecution responded that the district court judge ruled that the victim was competent, and that while the victim would have to answer certain foundational questions at trial in order to ensure that she was competent to testify, no separate hearing was required.

On November 27, 2013, a hearing was held on several motions. The trial court ruled that the statute did not allow defendant's request regarding the videorecording. The trial court ruled that it would determine whether the victim was competent and any other matters could be handled during cross-examination. The prosecution agreed to allow the testimony of Diana Allen and Breidenich as relevant evidence. With regard to Kizzy, the trial court ruled that the defense could challenge her testimony on cross-examination.[1] The trial court further ruled that Orville Allen's testimony would be admitted if it was relevant.

On March 26, 2014, defendant filed a motion to limit the prosecution's rebuttal expert. Defendant argued that Killips should not be permitted to testify about research and studies, and if she is allowed, the defense should be allowed surrebuttal. The prosecution argued, among other things, that the motion was premature.

On March 28, 2014, defendant filed an emergency motion to dismiss or, in the alternative, adjourn trial. Defense counsel stated that, in preparation for trial, she recently became aware that witness interviews were recorded and this was not previously disclosed. The witnesses stated that the police report did not accurately reflect what they told law enforcement, so the recordings of the interview are highly favorable, exculpatory material. Although defense counsel believed the assistant prosecutor in this case did not have the evidence, he had a duty to discover any evidence favorable to defendant that was in the possession of the police.

Defendant's jury trial began on April 7, 2014. During defense counsel's opening statement, she argued that this case was about "tunnel vision," and that the victim's mother as well as law enforcement had "tunnel vision" in this case. In addition to the testimony described above, the transcript of Care House interview was admitted and played for the jury. Defendant requested that the video be played and the transcript be used because it would be hearsay for the prosecutor to introduce it.

After the prosecution rested its case, defendant moved for a directed verdict on all charges. The trial court denied the motion.

Defense counsel agreed to allow the prosecution's potential rebuttal expert sit in the courtroom for Dr. Okla's testimony. Defense counsel indicated that she filed a motion for surrebuttal if the rebuttal expert was allowed to testify, and the trial court did not rule on the motion. Defense counsel subsequently argued that she would only be introducing evidence regarding suggestibility and memory issues, not characteristics of sexually abused children or patterns of disclosure, and the rebuttal testimony should be limited accordingly. The trial court indicated that it would allow rebuttal testimony on "delay in reporting information, adding additional information, disclosures by a child who may have suffered a traumatic event, rebutting

---

[1] Kizzy was not, however, called as a witness at trial.

that her testimony is false and based on outside influences and suggestibility and the forensic interview." Defense counsel stated, "Okay." Defense counsel then stated that she did not ask about delayed disclosure, and the trial court stated, "You did. You talked about adding different information later on."

During closing argument, the prosecutor stated:

You need to go back there and you need to decide do you believe [the victim] or do you believe the defendant.

Why do people lie? To avoid consequences. That's why people lie.

Who had the motive to lie in this case? Defendant. The defendant. Even he himself when he got up there and testified gave you no reason why [the victim] would be lying about these actions.

The prosecutor also argued:

There are way too many coincidences and red flags in this case. And I wrote down the ones that I could think of and I'm sure that you all thought of, of not these same ones, other ones.

Defendant volunteering at this preschool. Defendant giving kids marbles and candy. Defendant taking kids to the playground when he's not a teacher. Defendant being at this school as often as he was. Defendant swinging kids around by their arms. Giving piggyback rides to these children. Being alone with the kids during marble time which he admitted himself. Being alone with the kids in the garden again, which he admitted himself. Trying to take Diana Allen's granddaughter into the woods. Kids taking candy from the defendant's pocket. Defendant admitting that that rule about being alone with kids was not always followed. . . .

* * *

This was too many red flags. A quarter of this amount would be too many red flags.

The prosecutor indicated for the record that, during its deliberations, the jury requested the Care House interview and the parties agreed to have it played from the hard drive, rather than the disk, so that it would play without skipping. On April 15, 2014, the parties entered a stipulation that, for clarity purposes, the jury could watch the Care House video from the court computer's hard drive, rather than from the disk admitted at trial. The jury also requested "better speakers to hear clearly," and external speakers were provided.

The jury found defendant guilty of all charges. On May 7, 2014, the trial court sentenced defendant 25 to 50 years' imprisonment for the fist-degree CSC convictions and 15 to 22 years' imprisonment for the second-degree CSC convictions.

## II. INEFFECTIVE ASSISTANCE OF COUNSEL

First, defendant contends that defense counsel was ineffective in (1) admitting the videotaped forensic interview as a trial exhibit and permitting witnesses to repeat the victim's allegations made during that interview; (2) stipulating to allow the videotaped forensic interview to be taken into the jury room and replayed by the jurors without any supervision or instructions from the trial court; (3) failing to object to Detective Schuler's and Killips's testimony vouching for the veracity of the victim and offering opinions of defendant's guilt by relying on the prestige of law enforcement; (4) failing to object to the prosecutor's misconduct during closing argument; and (5) stipulating to the admission of speculative testimony of other parents that defendant had unhealthy and abnormal interactions with children. We disagree.

"[A] defendant must move the trial court for a new trial or evidentiary hearing to preserve the defendant's claim that his or her counsel was ineffective." *People v Lane*, 308 Mich App 38, 68; 862 NW2d 446 (2014). Because defendant did not move for a new trial or evidentiary hearing in the trial court, this issue is unpreserved. "A defendant's claim of ineffective assistance of counsel 'is a mixed question of fact and constitutional law.' Generally this Court reviews for clear error the trial court's findings of fact and reviews de novo questions of law." *Lane*, 308 Mich App at 67-68 (citations omitted). However, "[w]hen the trial court has not conducted a hearing to determine whether a defendant's counsel was ineffective, our review is limited to mistakes apparent from the record." *Id.* at 68.

"To prove that his defense counsel was not effective, the defendant must show that (1) defense counsel's performance fell below an objective standard of reasonableness and (2) there is a reasonable probability that counsel's deficient performance prejudiced the defendant." *Lane*, 308 Mich App at 68. "A defendant was prejudiced if, but for defense counsel's errors, the result of the proceeding would have been different." *Id.* "There is a presumption that counsel was effective, and a defendant must overcome the strong presumption that counsel's challenged actions were sound trial strategy." *People v Cooper*, 309 Mich App 74, 80; 867 NW2d 452 (2015). "This Court 'will not substitute [its] judgment for that of counsel on matters of trial strategy, nor will [this Court] use the benefit of hindsight when assessing counsel's competence.' " *Id.* (citation omitted). "The defendant . . . bears the burden of establishing the factual predicate for his claim." *Id.* (citation and quotation marks omitted).

### A. STIPULATION TO ADMIT VIDEOTAPED RECORDING AND PERMITTING WITNESSES TO REPEAT ALLEGATIONS

Defense counsel admitted the videotaped forensic interview of the victim as her exhibit, specifically stating that the defense was requesting that the video be played and the transcript be used because it would be hearsay for the prosecutor to do so. Defense counsel subsequently called Dr. Okla, an expert in forensic psychology, with expertise in suggestibility, forensic interviewing techniques, and memory research, who reviewed the forensic interview and offered her opinions thereon. Defense counsel's theory at trial was that the interview was not properly conducted and the victim was not telling the truth during the interview. Defense counsel specifically elicited testimony from Dr. Okla that the victim was unresponsive and said, "I think," numerous times in the interview. Dr. Okla was critical of the interviewer's failure to conduct a practice narrative with the victim and her repetition of questions. Therefore, defense

counsel used the forensic interview to support her theory at trial. As the prosecution points out, defendant's expert could not have offered her opinions on the interview if the interview was not admitted into evidence. See MRE 703 ("The facts or data in the particular case upon which an expert bases an opinion or inference shall be in evidence."). Accordingly, defendant has failed to overcome the strong presumption that her decision to admit the videotaped recording was sound trial strategy. See *Cooper*, 309 Mich App at 80.

Similarly, defense counsel repeated the victim's allegations in order to show the interviewer's questions and elicit Dr. Okla's testimony that such repeated questions were dangerous. Therefore, defense counsel's decision to refer to specific allegations made by the victim during the forensic interview was part of her strategy to challenge the interview and defendant fails to overcome the strong presumption that this was sound trial strategy. See *Cooper*, 309 Mich App at 80.

Finally, defendant challenges defense counsel's failure to object to Killips's testimony in which she also repeated the allegations of the victim made during the forensic interview. As discussed below in Issue III, Killips's testimony properly rebutted Dr. Okla's testimony. Given that Killips's testimony was within the proper scope of rebuttal, an objection by defense counsel would have been futile. "Counsel is not ineffective for failing to make a futile objection." *People v Thomas*, 260 Mich App 450, 457; 678 NW2d 631 (2004).

## B. STIPULATION TO ALLOW VIDEOTAPED INTERVIEW TO BE TAKEN INTO THE JURY ROOM

During the jury's deliberations, it requested to see the videotaped interview. The parties stipulated that, for clarity purposes, the jury could watch the Care House video from the court computer's hard drive, rather than from the disk admitted at trial. The trial court did not provide any specific instructions to the jury regarding the videotaped interview. Defendant argues that while "similar challenges have not been located in Michigan jurisprudence," other states had disapproved of allowing the jury to have unfettered use of such interviews, particularly in child sexual assault cases. The concern is that the jury may have unfairly emphasized this testimony over the trial testimony. See *State v Burr*, 195 NJ 119, 134; 948 A2d 627 (2008) (holding that precautionary procedures should be applied when a jury requests to replay a videotaped pretrial interview that has been introduced into evidence). However, given defendant's admission that there is no Michigan caselaw holding that the provision of a videotaped interview to the jury is impermissible, defense counsel's failure to object was not objectively unreasonable. See *Lane*, 308 Mich App at 68. In fact, MCR 2.513(P) provides in relevant part:

> If, after beginning deliberation, the jury requests a review of certain testimony or evidence that has not been allowed into the jury room under subrule (O), the court must exercise its discretion to ensure fairness and to refuse unreasonable requests, but it may not refuse a reasonable request. The court may make a video or audio recording of witness testimony, or prepare an immediate transcript of such testimony, and such tape or transcript, or other testimony or evidence, may be made available to the jury for its consideration.

Thus, the trial court was required to provide the evidence requested by the jury during deliberations, unless the request was unreasonable. Nonetheless, even if allowing a jury to have unfettered access to a videorecorded interview might be improper in some cases, defendant has failed to overcome the presumption that defense counsel's action was sound trial strategy in this case. See *Cooper*, 309 Mich App at 80. Again, defense counsel admitted the recording as a defense exhibit and drew attention to numerous parts of it throughout her case. It would have been reasonable strategy for defense counsel to want the jury to be able to view those portions again during its deliberations. This Court will not substitute its judgment for that of defense counsel or use the benefit of hindsight. See *id*. Along those same lines, given that the videorecording had already been played for the jury, the jury was provided the transcript of the interview, and there was already significant testimony about the interview, there is no reasonable probability that defendant was prejudiced by the jury's unsupervised access to the recording. See *Lane*, 308 Mich App at 68.

## C. FAILURE TO OBJECT TO TESTIMONY

Defendant contends that defense counsel was ineffective in failing to object to certain testimony at trial. First, he argues that defense counsel should have objected to Killips's testimony that the goal of the forensic interview is to obtain as much of the truth as the child could provide. Defendant argues this testimony implied that a child's statement during a forensic interview is truthful and constituted improper vouching. This testimony was followed by Killips's testimony that the interviewers were well-trained. Defendant claims that this testimony improperly relied on the prestige of law enforcement. Defendant further argues that Detective Shuler offered her personal opinion of defendant's guilt by testifying that no one else was ever considered as a suspect and that if she did not feel that there was enough evidence to support a charge she would not submit a case for prosecution. Defendant claims that this testimony also improperly relied on the prestige of law enforcement.

"It is generally improper for a witness to comment or provide an opinion on the credibility of another witness, because credibility matters are to be determined by the jury. An expert may not vouch for the veracity of a victim." *People v Dobek*, 274 Mich App 58, 71; 732 NW2d 546 (2007) (citations omitted). Moreover, "a witness cannot express an opinion on the defendant's guilt or innocence of the charged offense[.]" *People v Fomby*, 300 Mich App 46, 53; 831 NW2d 887 (2013) (citation and quotation marks omitted). Finally, "[i]t is error for the prosecutor to place the prestige of his office or that of the police behind the contention that a defendant is guilty." *People v Lucas*, 138 Mich App 212, 221; 360 NW2d 162 (1984).

Killips's testimony, when read in context, merely indicated that the goal of a forensic interview is to obtain the truth. She did not vouch for the victim's credibility and, in fact, specifically testified that she was not there to testify regarding whether the victim was telling the truth or whether defendant was guilty. Because her testimony was not improper, an objection would have been futile; therefore, defense counsel was not ineffective. See *Thomas*, 260 Mich App at 457.

When Killips testified that the Oakland County advocacy center was "really great" and the interviewers are "trained well," defense counsel did object that Killips was not answering the question. The trial court agreed and read the question again, and defense counsel again objected,

resulting in Killips answering the question that was asked. Because defense counsel did object to this testimony, defendant has failed to establish the factual predicate for this claim. See *Cooper*, 309 Mich App at 80. Although the unresponsive testimony was not stricken from the record, defendant fails to establish a reasonable probability that the failure to strike this testimony affected the outcome of the trial. Even Killips herself testified that the interview was not perfect.

With regard to Detective Shuler's testimony that no one else was ever considered as a suspect, this testimony was consistent with defense counsel's theory that the police had "tunnel vision." Accordingly, defendant has failed to overcome the strong presumption that defense counsel's failure to object was sound trial strategy. See *Cooper*, 309 Mich App at 80.

With regard to Detective Shuler's testimony that if she did not feel that there was enough evidence to support a charge she would not submit a case for prosecution, she was merely indicating that over the approximately 50 sexual assault cases she investigates each year many are not presented for criminal charges because it is determined that there was a misunderstanding or the alleged touching was for hygiene purposes. Therefore, Detective Shuler was not specifically commenting on this case, and even if the testimony did imply that Detective Shuler believed there was sufficient evidence to bring criminal charges in this case, contrary to defendant's assertion, it did not constitute an improper comment on his guilt because it merely referred to bringing charges. Detective Shuler did not opine whether defendant was, in fact, guilty of those charges. Accordingly, defense counsel was not ineffective in failing to object and defendant cannot show that the testimony affected the outcome of the proceedings. See *Lane*, 308 Mich App at 68.

### D. FAILURE TO OBJECT TO ALLEGED PROSECUTOR MISCONDUCT DURING CLOSING ARGUMENTS

Next, defendant contends that defense counsel was ineffective in failing to object during closing argument to the prosecutor's statements shifting the burden of proof to defendant and encouraging the jury to improperly rely on MRE 404(b) testimony. Defendant specifically refers to the prosecutor's argument that defendant had a motive to lie—in order to avoid consequences—and that defendant failed to give any reason why the victim would be lying.

> A prosecutor may not imply in closing argument that the defendant must prove something or present a reasonable explanation for damaging evidence because such an argument tends to shift the burden of proof. Also, a prosecutor may not comment on the defendant's failure to present evidence because it is an attempt to shift the burden of proof. However, a prosecutor's argument that inculpatory evidence is undisputed does not constitute improper comment. A prosecutor may also argue that the evidence was uncontradicted even if the defendant is the only person who could have contradicted the evidence. [*People v Fyda*, 288 Mich App 446, 463-464; 793 NW2d 712 (2010) (citations omitted).]

"Moreover, attacking the credibility of a theory advanced by a defendant does not shift the burden of proof." *People v McGhee*, 268 Mich App 600, 635; 709 NW2 595 (2005).

-13-

The prosecutor's argument that defendant failed to give any reason why the victim would be lying can reasonably be interpreted as argument that the victim's testimony was undisputed and as attacking defendant's theory at trial. Defendant testified that he was surprised that the victim was making these accusations. Because the argument was not improper, defense counsel's objection would have been futile. See *Thomas*, 260 Mich App at 457. However, even if the argument did impermissibly shift the burden of proof to defendant, "declining to raise objections, especially during closing argument, can often be consistent with sound trial strategy." *People v Unger*, 278 Mich App 210, 242; 749 NW2d 272 (2008). Defense counsel may not have wanted to draw attention to the fact that there was no evidence of a motive for the victim to lie. Moreover, the trial court instructed the jury that the prosecution must prove every element of the crime beyond a reasonable doubt and "[t]he Defendant is not required to prove his innocence or to do anything." "Jurors are presumed to follow their instructions, and it is presumed that instructions cure most errors." *People v Mahone*, 294 Mich App 208, 212; 816 NW2d 436 (2011). Accordingly, defendant has failed to establish that but for counsel's failure to object, there is a reasonable probability that the result of the trial would have been different. See *Lane*, 308 Mich App at 68.

Defendant also argues that defense counsel should have objected to the following argument made by the prosecutor in closing:

> There are way too many coincidences and red flags in this case. And I wrote down the ones that I could think of and I'm sure that you all thought of, of not these same ones, other ones.

> Defendant volunteering at this preschool. Defendant giving kids marbles and candy. Defendant taking kids to the playground when he's not a teacher. Defendant being at this school as often as he was. Defendant swinging kids around by their arms. Giving piggyback rides to these children. Being alone with the kids during marble time which he admitted himself. Being alone with the kids in the garden again, which he admitted himself. Trying to take Diana Allen's granddaughter into the woods. Kids taking candy from the defendant's pocket. Defendant admitting that that rule about being alone with kids was not always followed. . . .

> \* \* \*

> This was too many red flags. A quarter of this amount would be too many red flags.

The prosecutor went on to argue that defendant is a nice guy and that is how he was able to commit these crimes.

"Although a prosecutor may not argue facts not in evidence or mischaracterize the evidence presented, the prosecutor may argue reasonable inferences from the evidence." *People*

-14-

*v Watson*, 245 Mich App 572, 588; 629 NW2d 411 (2001). The prosecutor's argument merely summarized the evidence presented in this case,[2] and made reasonable inferences from that evidence. As noted by the prosecutor, defendant actually admitted many of the acts that the prosecutor characterized as "red flags." Contrary to defendant's assertion, the prosecutor did not argue that the jury should find defendant guilty based on his character. Rather, the prosecutor argued that, in hindsight, defendant's actions that seemed nice at the time were actually part of him grooming the victim and allowed him the opportunity to commit the crimes. The prosecutor's argument can also reasonably be interpreted as responding to defendant's theory that these acts were innocent. Because the prosecutor's argument was not improper, defense counsel's failure to object was not objectively unreasonable and any objection would have been futile. See *Lane*, 308 Mich App at 68; *Thomas*, 260 Mich App at 457.

### E. STIPULATION TO ADMIT AND FAILURE TO CHALLENGE TESTIMONY

Lastly, defendant argues that defense counsel was ineffective in stipulating to the admission of the testimony of two witnesses and failing to challenge the trial court's decision to admit the testimony of two other witnesses. Defense counsel stipulated to the admission of the testimony of Diana Allen and Breidenich. Defense counsel argued below that this evidence was not MRE 404(b) evidence, but simply evidence that the prosecution could present at trial. At trial, Diana Allen testified that in approximately 2007 or 2008, she and her grandchildren attended a spring or fall cleanup at the church. Diana Allen left her granddaughter, who was four years old, on the playground. When Diana Allen looked over, she saw defendant holding her granddaughter's hand and walking her away from the playground toward the wooded area. On another occasion, Diana Allen saw her granddaughter place her hand into defendant's pocket. When asked what she was doing, her granddaughter stated that she was getting candy. Breidenich testified at trial that she stopped her daughter's attendance after observing defendant playing on the playground with the children, even though a preschool teacher was on the other side of the playground.

Defendant has failed to establish that defense counsel's conduct was objectively unreasonably because Diana Allen's and Breidenich's testimony was consistent with defendant's trial testimony that there were times that he was alone with children and his theory that his interactions with the children were innocent. Accordingly, defense counsel could have reasonably believed that this testimony supported the defense theory. Therefore, defendant fails to overcome the presumption that defense counsel's conduct was sound trial strategy. See *Cooper*, 309 Mich App at 80. Moreover, even if defense counsel had successfully challenged the testimony of Diana Allen and Breidenich, there is no reasonable probability that the outcome of the trial would have been different absent such testimony. See *Lane*, 308 Mich App at 68.

Regarding Orville Allen's testimony that he saw his grandson take candy out of defendant's pocket and observed defendant take a group of children to the garden alone on one or two occasions, as well as Detective Shuler's testimony that she arrested defendant because she

---

[2] The admission of certain testimony, and defense counsel's stipulation to admit certain testimony, is discussed below.

-15-

had information that he was suicidal and possibly had access to a firearm, defense counsel did object to the testimony, although not on MRE 404(b) grounds. However, as discussed further below in Issue IV, there is no indication that the evidence was admitted under MRE 404(b), and, regardless, the evidence was properly admitted. Accordingly, any objection would have been futile. See *Thomas*, 260 Mich App at 457.

## III. ENHANCEMENT OF VIDEORECORDED STATEMENT

Next, defendant contends that the trial court erred in refusing to allow defense counsel the opportunity to enhance the audio of the forensic interview because there were over 90 inaudible sections and Michigan law does not categorically prohibit the incidental copying needed for enhancement. Alternatively, defendant argues that if MCL 600.2163a does prohibit such copying, then it is unconstitutional. We disagree.

Defendant sought to have the videorecording enhanced in a pretrial motion, which the trial court denied. Therefore, the statutory interpretation issue is preserved. See *People v Metamora Water Serv, Inc*, 276 Mich App 376, 382; 741 NW2d 61 (2007) ("For an issue to be preserved for appellate review, it must be raised, addressed, and decided by the lower court."). "[W]e review de novo the interpretation and application of statutes." *People v Stone*, 269 Mich App 240, 242; 712 NW2d 165 (2005). "[A] preserved, nonconstitutional error is not a ground for reversal unless 'after an examination of the entire cause, it shall affirmatively appear' that it is more probable than not that the error was outcome determinative." *People v Lukity*, 460 Mich 484, 496; 596 NW2d 607 (1999). "An error is deemed to have been 'outcome determinative' if it undermined the reliability of the verdict. In making this determination, the reviewing court should focus on the nature of the error in light of the weight and strength of the untainted evidence." *People v Elston*, 462 Mich 751, 766; 614 NW2d 595 (2000) (citations omitted). Defendant, however, did not argue in the trial court, as he does now on appeal, that MCL 600.2163a(9) is unconstitutional; therefore, this issue is unpreserved. See *Metamora Water Serv, Inc*, 276 Mich App at 382. Unpreserved claims of constitutional error are reviewed for plain error affecting substantial rights. *People v Carines*, 460 Mich 750, 763-764; 597 NW2d 130 (1999).

> To avoid forfeiture under the plain error rule, three requirements must be met: 1) error must have occurred, 2) the error was plain, i.e., clear or obvious, 3) and the plain error affected substantial rights. The third requirement generally requires a showing of prejudice, i.e., that the error affected the outcome of the lower court proceedings. "It is the defendant rather than the Government who bears the burden of persuasion with respect to prejudice." Finally, once a defendant satisfies these three requirements, an appellate court must exercise its discretion in deciding whether to reverse. Reversal is warranted only when the plain, forfeited error resulted in the conviction of an actually innocent defendant or when an error " 'seriously affect[ed] the fairness, integrity or public reputation of judicial proceedings' independent of the defendant's innocence." [*Id*. at 763 (citations omitted).]

MCL 600.2163a(9) provides:

A custodian of the videorecorded statement may release or consent to the release or use of a videorecorded statement or copies of a videorecorded statement to a law enforcement agency, an agency authorized to prosecute the criminal case to which the videorecorded statement relates, or an entity that is part of county protocols established under section 8 of the child protection law, 1975 PA 238, MCL 722.628, or as otherwise provided by law. The defendant and, if represented, his or her attorney has the right to view and hear a videorecorded statement before the defendant's preliminary examination. Upon request, the prosecuting attorney shall provide the defendant and, if represented, his or her attorney with reasonable access and means to view and hear the videorecorded statement at a reasonable time before the defendant's pretrial or trial of the case. *In preparation for a court proceeding and under protective conditions, including, but not limited to, a prohibition on the copying, release, display, or circulation of the videorecorded statement, the court may order that a copy of the videorecorded statement be given to the defense.* [Emphasis added.]

We need not decide here whether the statute prohibits copying in all cases or the constitutionality of such a prohibition, because we conclude that any error in denying defendant the opportunity to copy and enhance the audio of the videorecorded statement in this case was not outcome determinative. See *Lukity*, 460 Mich at 496. There is testimony in the record from Killips that, by increasing the volume and replaying the inaudible sections, it was possible to determine what was said at many, but not all, of those sections. A review of the transcript also shows that, after many of the sections noted as "inaudible," the interviewer repeated what the victim said in a question to the victim or asked the victim to repeat what she said. While other sections were not clarified by the interviewer, the experts in this case reviewed the videorecording and were able to offer their opinions. In particular, defendant's expert, Dr. Okla, was able to reach conclusions and testify at trial. Dr. Okla never indicated that the inaudible sections affected her analysis or ability to testify in this case. Defendant only speculates that enhancement of the audio could have also enhanced Dr. Okla's testimony. Finally, we cannot presume, based on the jury's request for speakers during deliberations, that the jury was unable to determine what the victim said at any critical part of the interview or that such inability affected its verdict. For these reasons, we conclude that the trial court's refusal to allow defendant the opportunity to copy and enhance the recording did not undermine the reliability of the verdict. See *Elston*, 462 Mich at 766. Also for these reasons, we conclude that defendant fails to show that any error affected the outcome of the lower court proceedings. See *Carines*, 460 Mich at 763.

IV. ADMISSION OF REBUTTAL TESTIMONY

Defendant also argues that the trial court erred in allowing the prosecution's rebuttal witness, Killips, to testify beyond the proper scope of rebuttal. We disagree.

"We do not disturb a trial court's decision regarding the admission of rebuttal testimony absent an abuse of discretion." *People v Steele*, 283 Mich App 472, 485-486; 769 NW2d 256 (2009). "An abuse of discretion occurs when the trial court chooses an outcome that falls outside the range of principled outcomes." *People v Gonzalez-Raymundo*, 308 Mich App 175, 186; 862 NW2d 657 (2014).

-17-

"Rebuttal evidence is limited to refuting, contradicting, or explaining evidence presented by the opposing party." *People v Humphreys*, 221 Mich App 443, 446; 561 NW2d 868 (1997). Defendant first argues that Killips improperly discussed the victim's allegation that defendant scratched her privacy place and improperly commented on the ability of a child to understand a particular question. However, the prosecutor referred to this allegation in his question regarding the victim's answer to "how was [defendant's] body." The prosecutor indicated in his question that the victim responded by stating that defendant has black hair. Based on this, Killips testified that children can be literal and make mistakes in answering questions. This testimony was proper rebuttal testimony because it refuted Dr. Okla's testimony that the child was unresponsive at times, by explaining why one of the victim's answers might seem unresponsive when it was really just a misunderstanding.

Defendant also argues that Killips improperly testified that she disagreed with Dr. Okla's interpretation of the victim's answer regarding how many times the victim put her mouth on defendant's penis. However, given that she was expressly disagreeing or contradicting Dr. Okla's testimony, this was clearly proper rebuttal testimony.

Defendant next contends that Killips improperly repeated the victim's demonstrative allegations. However, the prosecutor was asking Killips whether the victim's demonstrations were a concern. This testimony was also proper rebuttal because Dr. Okla testified that the victim was moving around the room and was unresponsive at times. Relatedly, defendant argues that Killips improperly offered her beliefs regarding children's possession of sexual vocabulary and understanding of sexual matters. However, Killips was explaining why children might do demonstrations. Accordingly, this testimony also refuted Dr. Okla's testimony that the child was unresponsive.

Defendant also contends that Killips improperly described the nature of the forensic interview. Dr. Okla testified regarding the parts of a forensic interview and that one part of the interview, the practice narrative, was missing. Killips testified about the parts of the forensic interview of the victim in this case. When defense counsel objected to questions related to the interview, the trial court ruled that the testimony was directly responsive to Dr. Okla's testimony about whether there was a practice narrative. Killips explained that there was "somewhat of a narrative about the summer and what usually happens when she goes to [her] grandparents['] house." Accordingly, the trial court did not abuse its discretion in concluding that this was proper rebuttal testimony.

Defendant next argues that Killips improperly stated her interpretation of what the interviewer was trying to establish through the interview. Killips testified that after the ground rule stage of the interview, the interviewer asked the victim to tell her why she was there for the interview. Killips explained that then "there was some discussion and then moving on through various acts, they attempt to figure out where exactly certain types of touches happen which can be difficult with young children." However, in general, Killips testimony about the various stages of the forensic interview in this case refuted Dr. Okla's testimony that the interview was flawed.

Defendant further argues that Killips improperly interpreted the interviewer's questions and speculated regarding the reasons for those questions. Killips explained that, at times, the

victim said that she did not understand the question and the interviewer rephrased so the victim could answer. Killips testified that "[w]hen you ask the same exact question over and over it is a problem, but when you ask a different question it's a different question." This testimony specifically contradicted Dr. Okla's testimony that it was improper for the interviewer to repeat questions. Accordingly, this was proper rebuttal testimony.

Lastly, defendant argues that Killips improperly described various forms of questions that may be used during a forensic interview. On the page cited by defendant, Killips testified regarding the victim's literal response to the question "how was [defendant's] body," which, as discussed above, properly refuted Dr. Okla's testimony that the child was unresponsive at times.

## V. ADMISSION OF TESTIMONY

Finally, defendant contends that the trial court erred in allowing the testimony of Diana Allen, Breidenich, Orville Allen, and Detective Shuler under MRE 404(b). We disagree.

Defense counsel stipulated to the admission of the testimony of Diana Allen and Breidenich at trial. Accordingly, defendant's claim regarding this testimony is waived. See *People v Carter*, 462 Mich 206, 215; 612 NW2d 144 (2000). Defendant, however, raises a claim of ineffective assistance of counsel. For the reasons discussed above in Issue I, this argument fails.

With regard to Orville Allen's testimony, defendant argued below that his testimony was irrelevant and, regardless, was not an other act within MRE 404(b). However, the trial court allowed the testimony at trial. Defendant argues on appeal that Orville Allen's testimony was other acts testimony, but was not admissible under MRE 404(b). Therefore, this claim is unpreserved. See *People v Aldrich*, 246 Mich App 101, 113; 631 NW2d 67 (2001) ("To preserve an evidentiary issue for review, a party opposing the admission of evidence must object at trial and specify the same ground for objection that it asserts on appeal."). Similarly, defense counsel objected at trial to Detective Shuler's testimony that defendant was contemplating suicide and had possible access to a firearm. She did not, however, object on MRE 404(b) grounds, and the trial court ruled that defense counsel opened the door to the testimony. Therefore, defendant's claim that this was improper MRE 404(b) testimony is unpreserved. See *Aldrich*, 246 Mich App at 113. This Court reviews unpreserved evidentiary error for plain error affecting substantial rights. *People v Coy*, 258 Mich App 1, 12; 669 NW2d 831 (2003).

There is no indication that Orville Allen's testimony was admitted under MRE 404(b). Although the prosecution filed a motion to admit Orville Allen's testimony under MRE 404(b), defendant argued that it was not other acts evidence. At the hearing on the prosecution's motion, the trial court ruled that Orville Allen's testimony would be admitted if it was relevant. At trial, his testimony was admitted without objection. Defendant now objects to Orville Allen's testimony that he saw his grandson take candy out of defendant's pocket and that he observed defendant taking groups of children to the garden by himself on one or two occasions. Given that this testimony was not admitted under MRE 404(b), defendant fails to establish plain error. Moreover, defendant fails to establish that any error in the admission of the testimony affected his substantial rights in light of the other testimony at trial, including defendant's testimony that Orville Allen's grandson took candy out of his pocket on one occasion, but Orville Allen was

present and was not mad, and that defendant would take groups of children out to the garden, but there was always a teacher following behind.

Similarly, Detective Shuler's testimony was not admitted under MRE 404(b). Her testimony was not mentioned in the prosecutor's motion and it was offered in rebuttal. Specifically, it rebutted defendant's testimony that his arrest was unnecessary because he was going to turn himself in. Detective Shuler explained that they arrested defendant because they had information that defendant was contemplating suicide and had possible access to a firearm. Therefore, defendant fails to establish plain error affecting his substantial rights in the admission of this testimony.

Affirmed.

/s/ Patrick M. Meter
/s/ Kurtis T. Wilder
/s/ Amy Ronayne Krause